THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LENORA DOTY, ELIZABETH SHAW, and TRACY SIMPSON, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>vs.<br><br>THE KROGER COMPANY,<br><br>                    Defendant. | Case No.:  1:21-cv-00198<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Lenora Doty, Elizabeth Shaw, and Tracy Simpson (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against The Kroger Company ("Kroger" or "Defendant"), and allege, upon personal knowledge as to their own actions and their counsel's investigation, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.      Plaintiffs bring this class action against Kroger for its failure to properly secure and safeguard its current and former employees' and customers' personally identifiable information stored on and/or shared using third party Accellion, Inc.'s ("Accellion") File Transfer Appliance ("FTA") file transfer service, including, without limitation, personally identifiable information ("PII")[1] such as names, home addresses, email addresses, phone

---

[1]      Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive

1

numbers, Social Security numbers, dates of birth, salary information such as net and gross pay and withholdings, and ("PHI") such as insurance information, prescription information, prescription number, prescribing doctor, medication names and dates, medical history, and medical treatment information and/or clinical history.

2.      Kroger is one of the largest supermarket retailers in the United States, headquartered in Cincinnati, Ohio with over 400,000 current employees and over 2,700 locations. It also operates several subsidiary chains including Bakers, City Market, Dillons, Food Co., Food 4 Less, Fred Meyer, Fred Meyers Jewelers, Fry's, Gerbes, Harris Teeter, Home Chef, JayC, King Soopers, The Little Clinic, Mariano's, Metro Market, Owen's, Pay Less, Pick 'n Save, QFC, Ralphs, Roundy's, Ruler Foods, Smith's, and Vitacost. Kroger operates over 2,200 pharmacy locations and an additional roughly 225 Little Clinic locations in the United States, making Kroger one of the largest pharmacies in the United States. Furthermore, Kroger provides personal finance and money services to customers and employees throughout the United States.

3.      According to Kroger, it was informed on January 23, 2021, that certain of its current and former customers' and employees' PII and PHI was disclosed through a data breach involving Kroger's third-party vendor, Accellion.  Accellion is a software company that purports to offer secure file transfer to its customers.  Accellion boasts the security of its "firewall" products that are intended to prevent data breaches: "When employees click the Accellion button, they know it's the safe, secure way to share sensitive information with the outside world."[2]  Kroger entrusted its employees' and customers' PII to Accellion for the purposes of storing and/or transferring certain of Kroger's files and data, including the PII at issue in this

and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

[2]       See https://www.accellion.com/company/ (last visited Mar. 18, 2021).

matter.

4.      In December 2020 and again in January 2021,[3] two hacker groups with ties to a financial crimes group named "FIN11" and a ransomware group called "Clop"[4] accessed files and data that numerous customers of Accellion, including Kroger, had stored on or shared with Accellion FTA (the "Data Breach").[5]

5.      On or about December 16, 2020, one of Accellion's customers notified it that its anomaly detector was triggered.  Accellion conducted an investigation from December 16, 2020 to December 19, 2020 and discovered that two vulnerabilities affecting its FTA, 9.12.370—SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104), were the root of the exploit that tripped FTA's built-in anomaly detector on its customer's device.[6]

6.      Then, on January 20, 2021, two more vulnerabilities, one in Accellion's Server-Side Request Forgery (CVE-2021-27103) and another in OS Command Execution (CVE-2021-27102) led to another exploit, which Accellion only discovered two days later through multiple customer service inquiries regarding anomalous activity indicative of a new exploit.[7]

7.      Kroger was aware and had full knowledge that Accellion's data security on the platform Kroger used was lax. In fact, prior to the breach, Accellion encouraged Kroger to move to a newer and more secure file transfer platform.

8.      Accellion's FTA file transfer product is self-described as a "legacy" product that

---

[3]      *See* https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (last visited Mar. 18, 2021).
[4]      *See* https://www.wired.com/story/accellion-breach-victims-extortion/ (last visited Mar. 9, 2021).
[5]      *See* https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident/ (last visited Mar. 7, 2021).
[6]      *See* https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf at 5 (last visited Mar. 20, 2021).
[7]      *Id.*

is 20 years old; it is incapable of preventing modern data security threats.

9.     Starting April 30, 2021, Accellion will no longer offer its FTA product.

10.    For years, Accellion has urged that its customers (such as Kroger) migrate to its newer, more secure product, "Kiteworks," which was launched roughly four years ago, yet even though advised to update its security by its own experts, Kroger still failed to maintain adequate security.

11.    On February 19, 2021, Kroger mailed data breach notices to those former and current customers and Kroger employees whose PII and PHI was accessed by unauthorized third parties.

12.    Kroger did not adequately safeguard Plaintiffs' data, and now they and apparently many other patients, current and former employees, and customers are the victims of a significant data breach that will negatively affect them for the rest of their lives.

13.    Kroger is responsible for allowing this data breach through its failure to implement and maintain reasonable safeguards and its failure to comply with industry-standard data security practices.  Despite its role in managing so much sensitive and personal information, Kroger failed to utilize a competent third-party data transfer company when handling and/or transferring Kroger's employees' and customers' PII and PHI, and Kroger chose to use an outdated and unsecure transfer platform.

14.    Kroger had numerous statutory, regulatory, contractual, and common law obligations to keep their PII, including PHI, confidential, safe, secure, and protected from unauthorized disclosure or access.

15.    Plaintiffs and those similarly situated rely upon Kroger to maintain the security and privacy of the PII entrusted to it; when providing their PII, they reasonably expected and

understood that Kroger would comply with its obligations to keep the information secure and safe from unauthorized access.

16. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' PII, Defendant assumed legal and equitable duties to those individuals.

17. The exposed PII and PHI of Plaintiffs and Class members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiffs and Class members face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

18. This PII and PHI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect PII of Plaintiffs and Class members.

19. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class members; (ii) warn Plaintiffs and Class members of its inadequate information security practices; and (iii) effectively secure software containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents.

20. Plaintiffs and Class members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and, significantly (iv) the continued and certainly an increased risk to their PII, which may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

5

21.     Defendant disregarded the rights of Plaintiffs and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' PII and PHI was safeguarded, and failing to take available steps to prevent an unauthorized disclosure of data. As a result, the PII and PHI of Plaintiffs and Class members was compromised through disclosure to an unknown and unauthorized third party.

22.     Accordingly, Plaintiffs, on behalf of themselves and other members of the Class, assert claims for breach of implied contract, negligence, and unjust enrichment and seek injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity or by law.

## II. PARTIES

### Plaintiff Lenora Doty

23.     Plaintiff Lenora Doty is a citizen of Indiana residing in Allen County, Indiana. Ms. Doty is a former Kroger employee.  Ms. Doty received a Notice of Data Breach from Defendant Kroger dated March 11, 2021 notifying her that her PII had been accessed during the Data Breach.  The letter stated that Kroger believes the "impacted information includes names, email addresses and other contact information, dates of birth, Social Security number, and for some associates or former associates, may have also included certain salary information such as net and gross pay and withholdings."  Before receiving this letter, Ms. Doty was unaware that any breach had occurred or that her PII had been compromised.

24.     The letter offered to provide Ms. Doty with a limited two-year subscription to the credit monitoring service, Experian IdentityWorks.  Ms. Doty has subscribed to IdentityWorks. However, the two-year subscription is insufficient, as the data included in the breach is

permanently compromised. Thus, following the expiration of the two-year subscription, Ms. Doty will be forced to pay out of pocket for credit monitoring, which will be necessary for the rest of her life. Moreover, the letter Ms. Doty received from Kroger indicates that if she believes there was fraudulent use of her information and if an Experian agent determines that Identity Restoration support is needed, then an Experian Identity Restoration agent will be "available to work with [her] to investigate and resolve each incident of fraud that occurred." However, the letter also indicates that the Identity Restoration service is only available for "one year from the date of this letter," or only until March 11, 2022. This one-year access to Identity Restoration services is insufficient as Ms. Doty will be dealing with the consequences of the Data Breach long after February 19, 2022.

25. Moreover, apparently **someone has already stolen Ms. Doty's PII and has committed identity theft against her**. Ms. Doty recently received an "Employment related Identity Theft Notice" dated March 15, 2021 from the Department of the Treasury, Internal Revenue Service. The notice says, "We believe another person may have used your Social Security number (SSN) to obtain employment." The notice continues: "We placed a marker on your tax account to identify that you may have been a victim of identity theft. . . . We strongly suggest you monitor your credit reports and all financial accounts for signs of misuse of your personal information."

26. Furthermore, on February 1, 2021, Ms. Doty also received an email from Google indicating that some of her "saved passwords were exposed in a non-Google data breach" and that she should "[c]hange them now to secure [her] accounts." Ms. Doty believes that the compromise of her saved passwords associated with her email address— the same email address

she used to apply for employment with Kroger and the same email address associated with her Kroger shopping application—could be related to the Data Breach.

27.     Ms. Doty entrusted her PII and other confidential information such as contact information, financial information and/or Social Security number to Kroger with the reasonable expectation and understanding that Kroger would take, at a minimum, industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her.

28.     Ms. Doty has frequently checked her bank and credit accounts since receiving Kroger's letter notifying her of the Data Breach.  Since learning about the Data Breach, Ms. Doty has suffered and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the breach of her sensitive, personal, financial and health information.

*Plaintiff Elizabeth Shaw*

29.     Plaintiff Elizabeth Shaw is a citizen of Indiana residing in Wells County, Indiana. Ms. Shaw is a former Kroger employee.  Ms. Shaw received a Notice of Data Breach from Defendant Kroger dated March 11, 2021 notifying her that her PII had been accessed during the Data Breach.  The letter stated that Kroger believes the "impacted information includes names, email addresses and other contact information, dates of birth, Social Security number, and for some associates or former associates, may have also included certain salary information such as net and gross pay and withholdings."  Before receiving this letter, Ms. Shaw was unaware that any breach had occurred or that her PII had been compromised.

30.     The letter offered to provide Ms. Shaw with a limited two-year subscription to the credit monitoring service, Experian IdentityWorks.  However, the two-year subscription is

insufficient, as the data included in the breach is permanently compromised. Thus, following the expiration of the two-year subscription, Ms. Shaw will be forced to pay out of pocket for credit monitoring, which will be necessary for the rest of her life. Moreover, the letter Ms. Shaw received from Kroger indicates that if she believes there was fraudulent use of her information and if an Experian agent determines that Identity Restoration support is needed, then an Experian Identity Restoration agent will be "available to work with [her] to investigate and resolve each incident of fraud that occurred." However, the letter also indicates that the Identity Restoration service is only available for "one year from the date of this letter," or only until March 11, 2022. This one-year access to Identity Restoration services is insufficient as Ms. Shaw will be dealing with the consequences of the Data Breach long after February 19, 2022.

31.    On February 1, 2021, Ms. Shaw also received an email from Google indicating that some of her saved passwords in Google were compromised from a non-google data breach and that she should take steps now to secure her Google account. Ms. Shaw believes that the compromise of her saved passwords associated with her email address—the same email address she used to apply for employment with Kroger and the same email address associated with her Kroger shopping application—could be related to the Data Breach.

32.    Ms. Shaw entrusted her PII and other confidential information such as contact information, financial information and/or Social Security number to Kroger with the reasonable expectation and understanding that Kroger would take, at a minimum, industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her.

Ms. Shaw has frequently checked her bank and credit accounts since receiving Kroger's letter notifying her of the Data Breach. Since learning about the Data Breach, Ms. Shaw has suffered

and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the breach of her sensitive, personal, financial and health information.

***Plaintiff Tracy Simpson***

33.     Plaintiff Tracy Simpson is a citizen of Kentucky residing in Boone County, Kentucky.  Ms. Simpson is a Kroger pharmacy customer and shops at Kroger approximately twice per week.  Ms. Simpson has also purchased money orders at Kroger.   Ms. Simpson received a Notice of Data Breach from Defendant Kroger dated February 19, 2021 notifying her that her PII (including PHI) had been accessed during the Data Breach.  The letter stated that Kroger believes the "impacted information may include all, or a subset of, the following:  names, email addresses, phone numbers, home addresses, dates of birth, information to process insurance claims, prescription information such as prescription number, prescribing doctor, medication names and dates, medical history, as well as certain clinical services, such as whether you were ordered an influenza test."  Before receiving this letter, Ms. Simpson was unaware that any breach had occurred or that her PII and PHI had been compromised.

34.     The letter offered to provide Ms. Simpson with a limited two-year subscription to the credit monitoring service, Experian IdentityWorks.  Ms. Simpson has subscribed to the IdentityWorks service.  However, the two-year subscription is insufficient, as the data included in the breach is permanently compromised.  Thus, following the expiration of the two-year subscription, Ms. Simpson will be forced to pay out of pocket for credit monitoring, which will be necessary for the rest of her life.  Moreover, the letter Ms. Simpson received from Kroger indicates that if she believes there was fraudulent use of her information and if an Experian agent determines that Identity Restoration support is needed, then an Experian Identity Restoration agent will be "available to work with [her] to investigate and resolve each incident of fraud that

occurred." However, the letter also indicates that the Identity Restoration service is only available for "one year from the date of this letter," or only until February 19, 2022. This one-year access to Identity Restoration services is insufficient as Ms. Simpson will be dealing with the consequences of the Data Breach long after February 19, 2022.

35.     Since the Data Breach, Ms. Simpson has received and continues to receive an inordinate number of SPAM telephone calls.

36.     Ms. Simpson entrusted her PII, PHI and other confidential information such as contact information, health insurance policy information, prescription information, medical conditions, and financial information to Kroger with the reasonable expectation and understanding that Kroger would take, at a minimum, industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her. Ms. Simpson would not have used Kroger's services had she known that Kroger would not take reasonable steps to safeguard her sensitive PII and PHI.

37.     Ms. Simpson has frequently checked her bank and credit accounts since receiving Kroger's letter notifying her of the Data Breach.

38.     Since learning about the Data Breach, Ms. Simpson has suffered and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the breach of her sensitive, personal, financial and health information.

***Defendant The Kroger Company***

39.     Defendant The Kroger Company is a corporation incorporated under the laws of Ohio with its principal place of business in Cincinnati, Ohio. Kroger provides prescription drug services through Kroger Pharmacies, of which there are over 2,200 locations nationwide. Kroger

requires its customers to provide contact information (such as name, email, and residential address), and financial information (such as Health Services Account or credit card account information). As part and parcel of providing and/or accepting insurance, customers must also provide their sensitive health information and other personal information, such as dates of birth and Social Security numbers.  Kroger creates electronic health records of its customers by gathering medical information from them. This information comes from the customers and from other individuals or organizations, such as physicians and/or insurance plans.  Kroger also provides money services to its customers, such as money orders, check cashing, bill pay, Coinstar, and the ability to send money.[8]

40.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

### III. JURISDICTION AND VENUE

41.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class member (including named Plaintiffs Doty and Shaw, citizens of Indiana, and Plaintiff Simpson, citizen of Kentucky), is a citizen of a state different from Defendant to establish minimal diversity.

---

[8]     *See* https://www.kroger.com/d/money-services (last visited Mar. 18, 2021).

42.     This Court has general personal jurisdiction over Kroger because Kroger is headquartered in this District.

43.     Venue is proper in this District under 28 U.S.C. §1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and Defendant Kroger conducts substantial business in this District.

## IV. FACTUAL ALLEGATIONS

*Background*

44.     Kroger used Accellion's legacy Accellion FTA to transfer its current and former employees' and its customers' PII and PHI. Accellion FTA purportedly allows users to "transfer large and sensitive files securely."[9]

45.     Kroger used Accellion FTA to transfer some of Plaintiffs' and Class members' most sensitive and confidential information, including names, Social Security numbers, dates of birth and other PII, which is static, does not change, and can be used to commit myriad financial crimes.

46.     Plaintiffs and Class members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class members demand security to safeguard their PII.

47.     Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class members' PII from involuntary disclosure to third parties.

48.     Accellion's legacy FTA software relied on CentOS 6 to function.

49.     In late 2019, CentOS announced it would no longer support CentOS 6 after

---

[9]      *See* https://www.accellion.com/products/fta/ (last visited Mar. 20, 2021).

November 30, 2020.

50.     Upon information and belief, the fact that it was no longer supported by CentOS meant that the FTA software would no longer receive expected vulnerability testing and patching.

***The Data Breach***

51.     In December 2020 and again in January 2021,[10] two hacker groups with ties to a financial crimes group named "FIN11" and a ransomware group called "Clop"[11] accessed files and data that Kroger and other Accellion customers had stored on or shared with Accellion FTA.[12]

52.     On or about December 16, 2020, one of Accellion's customers notified it that its anomaly detector was triggered.  Accellion conducted an investigation from December 16, 2020 to December 19, 2020 and discovered that two vulnerabilities affecting FTA 9.12.370—SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104) were the root of the exploit that tripped FTA's built-in anomaly detector on one of its customer's devices.[13]

53.     Accellion claims it notified its Accellion FTA customers of the Data Breach on December 23, 2020.[14]

54.     On January 12, 2021, Accellion issued a press release stating that it had resolved a vulnerability in Accellion FTA and "released a patch within 72 hours to the less than 50

---

[10]     *See* https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf (last visited Mar. 18, 2021).
[11]     *See* https://www.wired.com/story/accellion-breach-victims-extortion/ (last visited Mar. 9, 2021).
[12]     *See* https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident/ (last visited Mar. 7, 2021).
[13]     *See* https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf at 5 (last visited Mar. 20, 2021).
[14]     *Id.*

customers affected."[15]

55.     Then, on January 20, 2021, two more vulnerabilities, one it its Server-Side Request Forgery (CVE-2021-27103) and another in OS Command Execution (CVE-2021-27102) led to another exploit, which Accellion only discovered two days later through multiple customer service inquiries regarding anomalous activity indicative of a new exploit.[16]

56.     The Data Breach involved four separate vulnerabilities in Accellion's FTA platform.  As *Wired* reported:

> "These vulnerabilities are particularly damaging, because in a normal case an attacker has to hunt to find your sensitive files, and it's a bit of a guessing game, but in this case the work is already done," says Jake Williams, founder of the security firm Rendition Infosec, which is working on remediating an Accellion FTA-related breach. "By definition, everything sent through Accellion FTA was pre-identified as sensitive by the user."[17]

57.     On or around February 19, 2021, Kroger announced it has been affected by the Data Breach.[18]  Kroger stated that it was "informed of the incident's effect on January 23, 2021."[19]  Kroger's announcement further states, in part:

> **Information About the Accellion Incident**
> The Kroger Family of Companies ("Kroger") has confirmed that it was impacted by the data security incident affecting Accellion, Inc. Accellion's services were used by Kroger, as well as many other companies, for third-party secure file transfers. Accellion notified Kroger that an unauthorized person gained access to certain Kroger files by exploiting a vulnerability in Accellion's file transfer service.

---

[15]     *See* https://www.accellion.com/company/press-releases/accellion-responds-to-recent-fta-security-incident/ (last visited Mar. 7, 2021).

[16]     *See* https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf at 5 (last visited Mar. 20, 2021).

[17]     *See* https://www.wired.com/story/accellion-breach-victims-extortion/ (last visited Mar. 18, 2021).

[18]     *See* https://www.supermarketnews.com/technology/kroger-reports-data-breach-third-party-file-transfer-service (last visited Mar. 7, 2021).

[19]     *See* https://www.kroger.com/i/accellion-incident (last visited Mar. 7, 2021).

**Here are the facts as we understand them:**
The incident was isolated to Accellion's services and did not affect Kroger's own IT systems, including its grocery store systems. However, the Accellion software was used for secure file transfers of certain HR data and pharmacy and clinic customer information. The impacted data varies by individual, and we are notifying impacted customers and associates directly by mail (USPS) to make them aware of what sensitive data may have been impacted for them. Approximately 2% of our customers were impacted. Our investigation has concluded, and we can confirm non-sensitive information, including information about our loyalty program for coupons and product discounts, was also impacted. This incident did not impact customer passwords, credit or debit card or digital wallet information.[20]

58. As with all pharmacies and healthcare providers, use of Kroger's health and pharmacy services requires disclosure of PII and PHI to Kroger by all of its health and pharmacy customers.

59. Similarly, as an employer, Kroger required its employees to provide much of the same sensitive PII as its customers.

60. Kroger is fully aware of how sensitive the PII and PHI it stores and maintains is. It is also aware of how much PII and PHI it collects, uses, and maintains from each Plaintiffs or Class member.

61. By requiring the production of, collecting, obtaining, using, and deriving benefits from Plaintiffs' and the Class members' PII and PHI, Kroger assumed certain legal and equitable duties and knew or should have known that it was responsible for the diligent protection of the PII and PHI it collected, stored, and shared with Accellion.

***Kroger Knew it was and Continues to be a Prime Target for Cyberattacks***

62. Kroger knew it was an ideal target for hackers and those with nefarious purposes related to consumer, employee, and patient data. They processed and saved multiple types and

---

[20] *Id.*

many levels of PII and PHI.

63. Yet, Kroger did not follow generally accepted industry standards to protect the sensitive PII and PHI entrusted to it.

64. Kroger processed payment information, in addition to all the information about prescription medication, healthcare, and any other information that it might demand as a pharmacy and healthcare provider, such as Social Security number, age, gender, and prior health history. In doing so, Kroger relied upon outdated software from Accellion to transfer such data without adequate security measures.

65. The use of Money Services by Kroger's customers and/or employees similarly required the entrustment of sensitive PII.

66. The seriousness with which Defendant should have taken its data security is shown by the number of data breaches perpetrated in the healthcare and retail industries in the last few years.

67. Despite knowledge of the prevalence of healthcare and retail data breaches, Defendant failed to prioritize its customers' and/or employees' data security by implementing reasonable data security measures to detect and prevent unauthorized access to the millions of sensitive data points of its customers and employees.

68. As a highly successful, publicly traded company with a market capitalization of roughly $25 billion, Kroger had the resources to invest in the necessary data security and protection measures, as it was told to do. Yet, it did not — instead, consciously disregarding the known risks and continuing to use Accellion's outdated legacy technology.

69. Defendant failed to undertake adequate analyses and testing of its own systems, adequate personnel training, and other data security measures to avoid the failures presented to

Kroger's customers and employees in late February of 2021, but which occurred in December of 2020 and January of 2021.

70.     Despite its awareness, Defendant did not take the necessary and required minimal steps to secure Plaintiffs' and the Class members' PII and PHI. As a result, hackers breached and stole important PII and PHI from at least hundreds of thousands of Kroger's customers and employees.

***Kroger Provided Misleading Information to Plaintiffs and the Class Members***

71.     Kroger's letters to Plaintiffs and members of the Class were patently deficient because they failed to disclose the full range of information that may have been compromised in the breach, downplayed the risk its customers and employees face as a result of the breach, and failed to provide customers and employees with important information such as when the breach occurred, how the breach occurred, or the number of individuals affected.

72.     For example, the letter falsely implies that the decision to discontinue Accellion's services was timely and provided a benefit to the customers and employees affected by the breach, when, in fact, Kroger had prior knowledge Accellion's services were deficient yet failed to act, and the decision to discontinue Accellion's services had absolutely no impact on the vast amounts of data exposed.

73.     The letter also downplayed the harmful effects to customers and employees of the breach by stating, in the third sentence, that Kroger has "no indication of fraud or misuse of your personal information as a result of this incident." The fact that Kroger itself had not detected fraud or misuse at the time the letter was written is meaningless; customers and employees were (and remain) at imminent risk of identity theft and other fraud—it is common sense that such fraud or misuse was the reason criminals obtained the data in the first place.

74. Furthermore, the fact that Kroger had not detected fraud or misuse does not mean that such incidents had not already occurred—indeed, Kroger's letter encouraged Plaintiffs and the Class Members to "remain vigilant and monitor your accounts" and told them that if they see suspicious or unusual activity on their accounts, ***not to tell Kroger***, but to report it to someone else.

### *Defendant Owed a Duty to Adequately Safeguard Plaintiffs' and Class Members' PII*

75. Defendant is aware of the importance of security in maintaining personal information (particularly medical and financial information), and the value its users place on keeping their PII and PHI secure.

76. Defendant owes a duty to Plaintiffs and the Class members to maintain adequate security and to protect the confidentiality of their personal data.

77. Defendant owes a further duty to its customers and employees to immediately and accurately notify them of a breach of its systems to protect them from identity theft and other misuse of their personal data and to take adequate measures to prevent further breaches.

### *The Sort of PII at Issue Here is Particularly Valuable to Hackers*

78. Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

79. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40

to $200, and bank details have a price range of $50 to $200.[21] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

80. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

81. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited Mar. 7, 2021).

[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web (last visited Mar. 7, 2021).

[23] *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last accessed Mar. 7, 2021).

[24] SSA, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Mar. 7, 2021).

82.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

83.     Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[26]

84.     Here, the unauthorized access by the hackers left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential PII to mimic the identity of the user. The personal data of Plaintiffs and Class members stolen in the Kroger security breach constitutes a dream for hackers and a nightmare for Plaintiffs and the Class.   Plaintiffs' and Class members' stolen personal data represents essentially one-stop shopping for identity thieves.

---

[25]     Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed Mar. 7, 2021).
[26]     SSA, Identity Theft and Your Social Security Number, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 21, 2021).

85.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[27] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[28]

86.     More recently the FTC has released its updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

87.     The FTC has, upon information and belief, brought enforcement actions against businesses for failing to protect PII. The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII as a violation of the FTC Act, 15 U.S.C. § 45.

88.     General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that

---

[27]     *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf (last visited Mar. 21, 2021).

[28]     *Id*.  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

89.     Companies recognize that PII is a valuable asset. Indeed, PII is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other PII on a number of Internet websites. Plaintiffs' and Class members' personal data that was stolen has a high value on both legitimate and black markets.

90.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[30]

91.     Individuals rightfully place a high value not only on their PII, but also on the privacy of that data. Researchers have already begun to shed light on how much individuals value their data privacy – and the amount is considerable.

92.     Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information – the very injury at issue here – between $11.33 and $16.58 per website. The study also determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth

---

[29]     *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29 (last visited Mar. 21, 2021).

[30]     *See* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf, at 8:2-8 (last visited Mar. 21, 2021).

US$30.49 – 44.62."[31] This study was done in 2002, almost twenty years ago. The sea change in how pervasive the Internet is in everyday lives since then indicates that these values—when associated with the loss of PII to bad actors—would be exponentially higher today.

93.     Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

94.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns.  Former and current Kroger employees and/or customers whose Social Security numbers have been compromised now face a real and imminent substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

95.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change — Social Security number, driver's license number or government-issued identification number, name, and date of birth.

96.     This data demands a much higher price on the black market. Martin Walter,

---

[31]     Hann, Hui, *et al.*, The Value of Online Information Privacy: Evidence from the USA and Singapore, at 17, (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Mar. 21, 2021).

senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

97.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

98.     The PII of Plaintiffs and Class members was taken by hackers to engage in identity theft or and or to sell it to others criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

99.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding Plaintiffs' and Class members' PII, including Social Security numbers, driver's license or state identification numbers, and/or dates of birth, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class members a result of a breach.

100.     Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

101.     The injuries to Plaintiffs and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class members.

***Kroger's Post-Breach Activity was Inadequate***

---

[32]     Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/ anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Mar. 7, 2021).

102.     Personal, health, and financial information can be sold on the black-market almost immediately. As Illinois Attorney General Lisa Madigan aptly put it, "the second somebody gets your credit or debit card information, it can be a matter of hours or days until it's sold on the black market and someone's starting to make unauthorized transactions."[33] Thus, the compromised information could be used weeks before the receipt of any letter from Kroger, and Kroger's proposed solutions to the potential fraud are, therefore, woefully deficient.

103.     Immediate notice of a security breach is essential to protect people such as Plaintiffs and the Class members. Defendant failed to provide such immediate notice, in fact taking roughly one to two months to disclose to Plaintiffs and the Class Members that there had been a breach, thus further exacerbating the damages sustained by Plaintiffs and the Class resulting from the breach.

104.     Such failure to protect Plaintiffs' and the Class members' PII and PHI, and timely notify of the breach, has significant ramifications. The information stolen allows criminals to commit theft, identity theft, and other types of fraud. Moreover, because many of the data points stolen are persistent—for example, Social Security number, name, address, and medical history— as opposed to transitory—for example, the date of an appointment, criminals who purchase the PII and PHI belonging to Plaintiffs and the Class members do not need to use the information to commit fraud immediately. The PII and PHI can be used or sold for use years later.

105.     A single person's PHI can fetch up to $350 on the dark web. This is due, in part, to the broad scope and comprehensive nature of the data and information, which can be used to

---

[33]     Rosenthal, Phil, *Just assume your credit and debit card data were hacked,* Chicago Tribune, (Sep. 30 2014), https://www.chicagotribune.com/business/ct-data-breach-credit-scam-rosenthal-1001-biz-20140930-column.html (last visited Mar. 21, 2021).

steal identities for illegal drug or medical purchases or to defraud insurers. Allowing hackers to steal this type of information is particularly nefarious, as many banks or credit card providers have substantial fraud detection systems with quick freeze or cancellation programs in place, whereas the breadth and usability of PHI allows criminals to get away with misuse for years before healthcare-related fraud is spotted.

106.    Every year, victims of identity theft lose billions of dollars. And reimbursement is only the beginning, as these victims usually spend hours and hours attempting to repair the impact to their credit, at a minimum.

107.    Plaintiffs and the Class Members are at constant risk of imminent and future fraud, misuse of their PII and PHI, and identity theft for many years in the future as a result of the Defendant's actions and the Data Breach. They have suffered real and tangible loss, including but not limited to the loss in the inherent value of their PII and PHI, the loss of their time as they have had to spend additional time monitoring accounts and activity, and additional economic loss to mitigate the costs of injuries realized as a result of the breach.

## V. CLASS ALLEGATIONS

108.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

109.    The Class that Plaintiffs seek to represent is defined as follows:

> All current and former Kroger employees, pharmacy customers, Little Clinic patients, money services customers, and other Kroger customers whose private information was entrusted to Kroger and was compromised during the Data Breach (the "Class").

Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

27

Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges and court personnel in this case and their immediate family members.

110. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate, including but not limited to created subclasses as necessary.

111. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. The Class includes at least hundreds of thousands of individuals whose personal data was entrusted to Kroger and compromised in the Data Breach.

112. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Numerous questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class members, including the following:

    a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class members;

    b. Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class members to unauthorized third parties;

    c. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class members;

    d. Whether and when Defendant actually learned of the Data Breach;

    e. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class members that their PII had been compromised;

    f. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class members that their PII had been compromised;

g.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.  Whether Defendant's conduct was negligent;

j.   Whether Defendant knew or should have known that Accellion's FTA software was vulnerable to attack;

k.  Whether Plaintiffs and Class members are entitled to actual, damages, and/or statutory damages as a result of Defendant's wrongful conduct;

l.  Whether Plaintiffs and Class members are entitled to restitution as a result of Defendant's wrongful conduct; and

m.  Whether Plaintiffs and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

113.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class members because all had their PII compromised and stolen as a result of the Data Breach due to Defendant's misfeasance.

114.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's

conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

115. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages they have suffered are typical of other Class members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

116. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

117. The nature of this action and the nature of laws available to Plaintiffs and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial

and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

118.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

119.    Adequate notice can be given to Class members directly using information maintained in Defendant's records.

120.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class members and Defendant may continue to act unlawfully as set forth in this Complaint.

121.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

122.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

> a.  Whether Defendant owed a legal duty to Plaintiffs and Class members to

exercise due care in collecting, storing, using, and safeguarding their PII;

b.  Whether Defendant breached a legal duty to Plaintiffs and Class members to exercise due care in collecting, storing, using, and safeguarding their PII;

c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.  Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class members on the other, and the terms of that implied contract;

e.  Whether Defendant breached the implied contract;

f.  Whether Defendant adequately and accurately informed Plaintiffs and Class members that their PII had been compromised;

g.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendant was negligent failing to safeguard the PII of Plaintiffs and Class members; and,

i.  Whether Class members are entitled to actual damages, statutory damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I

### Negligence

123.    Plaintiffs and Class members re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 122.

124.    Kroger owed a duty to Plaintiffs and the Class to adequately safeguard the PII and PHI that it required its employees and customers to provide. Part and parcel with this duty was the duty to only entrust that data to third-party vendors with adequate and reasonable security measures and systems in place to prevent the unauthorized disclosure of such data.

125.    Kroger breached this duty by entrusting Accellion with the sensitive PII and PHI of its employees' and customers' when, as described throughout the Complaint, it knew or should have known that Accellion and Accellion's legacy FTA software was incompetent at preventing such unauthorized disclosure.

126.    As a direct and proximate result of Kroger's failure to exercise reasonable care in whom it entrusted its employees' and customers' sensitive PII and PHI to, the personal data of Kroger's employees and customers was accessed by ill-intentioned criminals who could and will use the information to commit identity theft or financial fraud. Plaintiffs and the Class face the imminent, certainly impending and substantially heightened risk of identity theft, fraud and further misuse of their personal data.

127.    As a proximate result of this conduct, Plaintiffs and the other Class Members suffered damage after the unauthorized data release and will continue to suffer damages in an amount to be proven at trial. Furthermore, Plaintiffs and the Class have suffered emotional distress as a result of the breach and have lost time and/or money as a result of past and continued efforts to protect their PII and prevent the unauthorized use of their PII.

## COUNT II

### Breach of Implied Contract

128.    Plaintiffs and Class members re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 122.

129.     Plaintiffs and the Class delivered their personal, health, and financial information to Kroger as part of the process of obtaining employment or services provided by Kroger.

130.     Plaintiffs and members of the Class entered into implied contracts with Kroger under which Kroger agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their data had been breached and compromised.

131.     In providing such data, Plaintiffs and the other members of the Class entered into an implied contract with Kroger whereby Kroger became obligated to reasonably safeguard Plaintiffs' and the other Class Members' sensitive, non-public information.

132.     In delivering their personal data to Kroger, Plaintiffs and Class Members intended and understood that Kroger would adequately safeguard their personal data.

133.     Plaintiffs and the Class Members would not have entrusted their private and confidential financial, health, and personal information to Kroger in the absence of such an implied contract.

134.     Kroger accepted possession of Plaintiffs' and Class members' personal data for the purpose of providing services or employment to Plaintiffs and Class members.

135.     Had Kroger disclosed to Plaintiffs and members of the Class that it would entrust such data to incompetent third-party vendors that did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and members of the Class would not have provided their PII and PHI to Kroger.

136.     Kroger recognized that its employees' and customers' personal data is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and members of the Class.

137.     Plaintiffs and members of the Class fully performed their obligations under the implied contracts with Kroger.

138.     Kroger breached the implied contract with Plaintiffs and the other members of the Class by failing to take reasonable measures to safeguard their data and instead entrusting such data to Accellion through Accellion's outdated and vulnerable legacy FTA software.

139.     As a proximate result of Defendant's conduct, Plaintiffs and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III

### Unjust Enrichment

140.     Plaintiffs and Class members re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 122.

141.     Plaintiffs and Class Members conferred a monetary benefit on Kroger in the form of monies or fees paid for services from Kroger. Kroger had knowledge of this benefit when it accepted the money from Plaintiffs and the Class Members.

142.     The monies or fees paid by the Plaintiffs and Class Members were supposed to be used by Kroger, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and Class Members.

143.     Kroger failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiffs and Class Members, instead entrusting such data to Accellion through Accellion's outdated and vulnerable legacy FTA software, and as a result Plaintiffs and the Class overpaid Kroger as part of the services they purchased.

144. Kroger failed to disclose to Plaintiffs and members of the Class that Accellion's practices and software and systems (which Kroger chose to utilize) were inadequate to safeguard Plaintiffs' and the Class Members PII and PHI against theft.

145. Under principles of equity and good conscience, Kroger should not be permitted to retain the money belonging to Plaintiffs and Class members because Kroger failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class members' personal, health, and financial information that they paid for but did not receive.

146. Kroger wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class members.

147. Kroger's enrichment at the expense of Plaintiffs and Class members is and was unjust.

148. As a result of Kroger's wrongful conduct, as alleged above, Plaintiffs and the Class members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Kroger, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members, request that the Court:

A. Certify this action as class action, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. Award declaratory, injunctive and other equitable relief as necessary to protect the interests of Plaintiffs and the other Class members;

C. Award restitution and damages to Plaintiffs and Class members in an amount to be determined at trial;

D.      Award Plaintiffs and Class members their reasonable litigation expenses and attorneys' fees as allowed by law;

E.      For prejudgment interest on all amounts awarded as allowed by law; and

F.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

DATED: March 23, 2021               Respectfully Submitted,

/s/ Michelle Kranz
Michelle Kranz (0062479)
**ZOLL & KRANZ, LLC**
6620 West Central Avenue, Suite 100
Toledo, Ohio 43617
Tel: 419-841-9623
Michelle@toledolaw.com

RACHELE R. BYRD (190634)
  (*Pro Hoc Vice Application Forthcoming*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
byrd@whafh.com

*Attorneys for Plaintiffs*